IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent, ) | |
| ) | |
| vs. ) | Case No. 17 C 2271 |
| ) | |
| WARREN BALLENTINE, ) | |
| ) | |
| Movant. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In 2014, a jury found Warren Ballentine guilty of mail fraud, wire fraud, financial institution fraud, and making false statements to financial institutions. He has moved, for a second time, under 28 U.S.C. § 2255 to set aside his conviction and sentence. Ballentine claims that he received ineffective assistance of counsel because one of the two attorneys on his defense team, Charles Ogletree, Jr., was later diagnosed with early-stage Alzheimer's disease. For the reasons below, the Court denies Ballentine's motion.

## Background

In January 2013, Warren Ballentine was charged in a six-count indictment with mail fraud, wire fraud, financial institution fraud, and making false statements to financial institutions. The charges all arose from an alleged mortgage fraud scheme. Specifically, the indictment alleged that two organizers, Bobbie Brown and Wanda Rivera-Burton, recruited people with good credit to act as straw buyers of properties that

were then rented out to tenants with weak credit who would not have qualified for the necessary mortgages themselves.  These straw buyers were paid a fee to submit fraudulent applications for mortgage loans used to purchase properties in the Chicago area.  The straw buyers falsely attested in their applications that they intended to occupy the properties they sought to mortgage.  Because owner-occupied properties are significantly less likely to fall into foreclosure, residency is an important factor in lenders' creditworthiness determinations.  In short, the scheme sought to leverage straw buyers' strong credit and false occupancy attestations to obtain mortgages on properties that could then be rented out for a profit.

Ballentine, then an attorney, was paid a modest fee to represent buyers at some of the home purchase closings.  The indictment alleged that, at the times of those closings, Ballentine was aware of the scheme and of the false statements made to obtain the mortgage loans but nevertheless advised the purchasers to sign off on them.

A jury trial on the charges against Ballentine took place in October 2014.  He was represented by two attorneys, Lewis Myers, Jr. and Charles J. Ogletree, Jr.  Myers, who passed away last year, was a prominent Chicago civil rights attorney.  Ogletree is a noted attorney, author, and professor at Harvard Law School, as well as a practicing attorney.  In July 2016, some twenty-one months after Ballentine's trial, Ogletree announced that he had been diagnosed with early-stage Alzheimer's disease.  That diagnosis is the primary basis for Ballentine's motion.

At trial, the prosecution focused on three properties:  (1) 1506 S. Spaulding Avenue; (2) 4822 S. Summerhill Drive; and (3) 921 W. 86th Place.  The government alleged that Ballentine knowingly participated in fraud during the closings on each of

2

these properties and called witnesses who testified regarding his statements and actions. On the sale of the Spaulding Avenue property—which closed February 4, 2005—the government called as witnesses Marilyn Claiborne, the straw buyer who purchased the property, and Lynn Cox, a loan officer who received kickbacks for originating Claiborne's fraudulent mortgage. On the sales of the Summerhill Drive and 86th Place properties—which closed on June 13 and 16, 2005, respectively—the government called Dina Dunn, the straw buyer who purchased both properties, and Wanda Rivera-Burton, the alleged organizer of the mortgage fraud scheme.

On direct examination, all four witnesses presented testimony suggesting that Ballentine knew he was participating in fraud, as discussed in further detail below. The cross-examinations of the witnesses were divided between Myers and Ogletree. On the Spaulding Avenue closing, Ogletree cross-examined Cox, and Myers cross-examined Claiborne. On the Summerhill Drive and 86th Place closings, Ogletree cross-examined Dunn and Myers cross-examined Rivera-Burton. Both Myers and Ogletree sought to discredit the witnesses' testimony by emphasizing their previous admissions of lying, inconsistencies in their testimony, their failures of personal and professional ethics, their financial interests in the mortgage fraud schemes, and their incentives to cooperate with the government to secure favorable plea agreements, among other things.

After about three days of testimony from these and other witnesses, the parties presented closing arguments on October 23. The jury began deliberations that afternoon and returned a unanimous guilty verdict on all counts on October 24, 2014.

At sentencing, the government sought to offer evidence of closings beyond the three discussed above in support of imposing a lengthier sentence and larger restitution

3

amount. Ballentine maintained his innocence. Noting that the burden of proof at sentencing is significantly lower than that for proving guilt at trial, the Court observed that there was "no direct evidence" that Ballentine knowingly participated in these additional transactions. Sentencing Tr., crim. dkt. no. 128, at 7:13-22.[1] In contrast with the direct evidence of Ballentine's knowledge presented by Cox, Claiborne, Rivera-Burton, and Dunn in relation to the closings on the Spaulding Avenue, Summerhill Drive, and 86th Place properties, the government invoked only circumstantial evidence of his knowledge in the other transactions—specifically, that his knowledge of wrongdoing could be inferred from suspicious timing. *See id.* at 9:7-11 ("And every transaction after that, our position is he knew that these buyers weren't going to be living there, he knew how the scheme operated, and he was participating in the scheme by representing them at the closing."). That is, the government argued that Ballentine's knowledge of the unlawful deception could be inferred for all transactions that occurred after the Spaulding Avenue closing in February 2005 because there was direct evidence that he knew about the scheme at the time of that transaction.

The Court was "not persuaded" that such an inference was sufficient, even under the less strenuous burden of proof applicable to sentencing, to prove Ballentine's knowing fraudulent participation in transactions other than the three for which there was direct testimony. *Id.* at 9:13-10:3. The Court was careful to note why the Spaulding Avenue, Summerhill Drive, and 86th Place closings were different: there was direct

---

[1] This order refers to entries in the docket for the underlying criminal case, N.D. Ill. Case No. 13 CR 88, using the shorthand "crim. dkt. no." Citations to the civil case corresponding to this and the previous petition, N.D. Ill. Case No. 17 C 2271, employ the shorthand "civ. dkt. no."

4

testimony about Ballentine's statements and actions at each of the three closings that supported a finding that he knew about the deception when he participated in these transactions. *See id.* at 13:13-23. Testimony from Cox and Claiborne about the Spaulding Avenue closing and from Rivera-Burton and Dunn about the Summerhill Drive and 86th Place closings was, the Court observed, sufficient to support a reasonable jury's finding that Ballentine knew, beyond a reasonable doubt, that he was committing fraud when he participated in those three transactions.[2] *Id.*

Ultimately, the Court declined to consider for sentencing purposes any transactions other than Spaulding Avenue, Summerhill Drive, and 86th Place. In light of Ballentine's relatively minor role in the fraud scheme, the likely collateral consequence of disbarment, and other factors, the Court imposed a sentence of only one day imprisonment, three years' supervised release, a special assessment of $600, and $140,940 in restitution, far less than the nearly $3 million requested by the government.

Ballentine then filed a notice of appeal. In December 2015, the Seventh Circuit appointed appellate counsel. Appellate counsel filed an *Anders* brief, *see Anders v. California*, 386 U.S. 738 (1967), in which she concluded that any challenge to Ballentine's conviction based on the sufficiency of the evidence at trial would be frivolous. The Seventh Circuit granted Ballentine until July 15, 2016 to file a response brief. He did not file a response. On December 22, 2016, the court ruled that counsel had "properly conclude[d] that it was frivolous to challenge the sufficiency of the

---

[2] Ballentine's new section 2255 motion again incorrectly asserts that the Court stated at sentencing that the prosecution had failed to prove its case. The Court discussed and rejected this baseless contention in its order on Ballentine's previous 2255 motion. *See United States v. Ballentine,* No. 17 C 2271, 2017 WL 3704847, at *4 (N.D. Ill. Aug. 28, 2017).

5

evidence" based on the testimony at trial, and it dismissed the appeal. *United States v. Ballentine*, 673 F. App'x 554, 556 (7th Cir. 2016).

In March 2017, Ballentine filed an untimely "motion to re-open appeal and/or grant a new trial." *See* crim. dkt. no. 152. This Court recharacterized that untimely filing as a motion under 28 U.S.C. § 2255 to vacate, correct, or set aside his conviction and sentence. The Court considered and ultimately denied that motion in an eleven-page order. *See United States v. Ballentine,* No. 17 C 2271, 2017 WL 3704847 (N.D. Ill. Aug. 28, 2017). Ballentine then filed another motion under section 2255 and a motion to terminate his probation early. The Court denied the section 2255 motion on the basis that Ballentine had not requested permission from the Seventh Circuit to file successive motions as required by 28 U.S.C. § 2255(h) but granted his motion to terminate his probation.

Ballentine then filed a request for permission to file a second section 2255 motion, which the Seventh Circuit dismissed on the basis that no permission was required under *Castro v. United States*, 540 U.S. 375 (2003). *See* civ. dkt. no. 17. Specifically, the Seventh Circuit concluded that because this Court had recharacterized Ballentine's original untimely filing as a motion under section 2255 without warning him that that recharacterization would bar him from future motions under 2255(h), Ballentine faced no bar to filing a second motion to vacate, correct, or set aside his conviction and sentence.[3] *See Castro*, 540 U.S. at 383. Ballentine subsequently refiled the section 2255 motion.

---

[3] Ballentine filed a second request with the Seventh Circuit for permission to file a successive section 2255 motion despite that court's order dismissing his first request. That request was dismissed on the same basis as the first one. *See* civ. dkt. no. 113.

6

**Discussion**

Under 28 U.S.C. § 2255, a court may vacate, set aside, or correct a sentence imposed in violation of the laws of the United States or otherwise subject to collateral attack. 28 U.S.C. § 2255(a). But such relief is appropriate "only for an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently resulted in the complete miscarriage of justice." *Harris v. United States*, 366 F.3d 592, 594 (7th Cir. 2004) (internal quotation marks omitted). And a court may only grant relief under section 2255 when a movant is in "custody," 28 U.S.C. § 2255(a), though that term has been construed broadly to include bond or supervised release, *see Virsnieks v. Smith*, 521 F.3d 707, 717-18 (7th Cir. 2008). In its March 2018 order dismissing Ballentine's request for permission to file a successive motion, the Seventh Circuit raised without deciding the question of whether this Court's order granting Ballentine's motion to terminate his supervised release early might release him from "custody" within the meaning of the statute. Because he originally filed this 2255 motion while still under court supervision, the Court concludes that the motion satisfied the "custody" requirement and that this Court therefore has jurisdiction. *See Carafas v. LaVallee*, 391 U.S. 234, 238 (1968) (noting that custody is determined at the time the petition is filed); *United States v. Payne*, 741 F.2d 887, 890 (7th Cir. 1984) (same).

**A.      Ineffective assistance of counsel standard**

In his second motion under section 2255, Ballentine argues that he received ineffective assistance of counsel in violation of the Sixth Amendment because one of his lawyers, Ogletree, was suffering from early-stage Alzheimer's at the time of the trial and,

as a result, failed to adequately cross-examine the government's witnesses.[4]  *See* civ. dkt. no. 19.  Specifically, Ballentine argues that "[t]here is now proof that" Ogletree "knew he had Alzheimer's at the time of the trial" and withheld that information from Ballentine and his other attorney, Myers.  *Id.* at 2.  The new evidence on which Ballentine bases his motion is a Washington Post article, published in December 2017, that suggests Ogletree was diagnosed with Alzheimer's in 2014 and that he suffered symptoms of the disease as early as 2013.  *See* Keith L. Alexander, *Civil Rights Attorney Charles Ogletree's Mind Is a Weapon.  Now, It's Fighting Him*, Wash. Post (Dec. 1, 2017).  As indicated earlier, the trial in the present case took place in October 2014.

"The Sixth Amendment's right to the effective assistance of counsel provides § 2255 relief when counsel's performance was objectively deficient."  *Swanson v. United States*, 692 F.3d 708, 714 (7th Cir. 2012) (internal quotation marks omitted).  "To succeed on such a claim, [a petitioner] must show both that his attorney's performance was objectively deficient—in other words, that it fell outside the wide range of competent representation—and that he was prejudiced by the subpar representation."  *United States v. Jones*, 635 F.3d 909, 915 (7th Cir. 2011); *see also Strickland v. Washington*, 466 U.S. 668, 687-96 (1984).  There is a presumption that counsel's conduct falls within the range of reasonable professional assistance.  *Swanson*, 692 F.3d at 714.

In limited circumstances, counsel's conduct can give rise to a per se violation of

---

[4] Ballentine also presents a new argument based on the elements for establishing an attorney-client relationship under Illinois law.  *See* civ. dkt. no. 19 at 2.  But he provides no explanation for why this discussion is relevant to or appropriate for a collateral attack under section 2255.

the Sixth Amendment right to counsel. This occurs when counsel is not present at all or at critical stages; fails completely to cross-examine or subject the opposing case to the adversarial process; has an actual conflict of interest; or fails to file a requested appeal. *See Cole v. United States*, 162 F.3d 957, 958 (7th Cir. 1998) (citing *United States v. Cronic*, 466 U.S. 648, 658–61 (1984)). In ruling on Ballentine's first section 2255 motion, the Court rejected Ballentine's argument that Ogletree was per se incompetent because of his early-stage Alzheimer's diagnosis. *See Ballentine*, 2017 WL 3704847, at *3 ("To the extent that Ballentine contends that Ogletree's Alzheimer's diagnosis gives rise to a per se violation of the Sixth Amendment, the Court disagrees."). Specifically, the Court reasoned that the per se rule is applicable "only when it will achieve the correct result in almost all cases," and concluded that, "because of the nature of Alzheimer's disease and its varied manifestations in different individuals," a trial attorney later being diagnosed with early-stage Alzheimer's does not give rise to a per se violation of the Sixth Amendment. *Id.* (first quoting *Jackson v. United States.*, No. 93-3782, 1994 WL 375427, at *2 (7th Cir. July 18, 1994); then quoting *Dows v. Wood*, 211 F.3d 480, 485 (9th Cir. 2000)). On this second section 2255 motion, Ballentine has presented no new evidence or argument supporting a different outcome.

Therefore, to succeed on his ineffective assistance of counsel claim, Ballentine must demonstrate that Ogletree's performance was objectively deficient and that the deficiency prejudiced him. *See Jones*, 635 F.3d at 915. Whether Ballentine was "prejudiced" does not, as he seems to suggest, turn on whether he faced consequences for being convicted of several felonies. Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Where an ineffective assistance of counsel claim arises from an alleged failure to adequately cross-examine a witness, the petitioner must explain "what [the witnesses'] responses to further cross-examination might have revealed [and] how those responses might have affected the result" at trial. *United States v. Rodriguez*, 53 F.3d 1439, 1449 (7th Cir. 1995).

**B.     Relevant testimony and cross-examination**

At the heart of Ballentine's motion lies his assertion that Ogletree failed to adequately cross-examine the witnesses upon whose testimony the jury based its verdict. That position fails for two reasons. First, Ballentine has failed to carry his burden in demonstrating that Ogletree's cross-examination was inadequate. Second, even assuming that Ogletree's cross-examinations satisfied the first element of the *Strickland* test, Ballentine has failed to identify how he may have been prejudiced in light of corroborating testimony from other witnesses who were cross-examined by Myers, his other attorney.

As discussed above, there were four key witnesses, two of whom (Claiborne and Cox) testified about the Spaulding Avenue closing and two of whom (Rivera-Burton and Dunn) testified about the Summerhill Drive and 86th Place closings. Cross-examination of these witnesses was split by Ogletree and Myers, with Ogletree cross-examining Cox and Dunn and Myers taking Claiborne and Rivera-Burton.

**1.     Spaulding Avenue witnesses**

The first of the key witnesses to testify was Lynn Cox. Cox worked as a loan

officer at one of the lenders defrauded by the mortgage scheme. Relevant here, Cox was the loan officer who originated the February 2014 mortgage on the Spaulding Avenue property in exchange for a kickback payment. During the trial, she gave a detailed description of the closing involving that property. *See* Trial Tr. Pt. 2, crim. dkt. no. 137, at 95:21-101:24. Cox testified, in relevant part, as follows:

> Q. As the attorney, what was [Ballentine] doing at the closing?
> A. Explaining the documents for [Claiborne, the straw buyer] to sign.
> Q. At some point during the closing, was Ms. Claiborne presented with an owner occupancy statement?
> A. Yes.
> Q. When presented with this owner occupancy affidavit, did Ms. Claiborne pause, or did she sign it right away?
> A. She paused.
> Q. Did Ms. Claiborne ask any questions about the owner occupancy affidavit when she paused?
> A. Yes, she did.
> Q. Who did she direct her question to?
> A. Attorney Warren Ballentine.
> Q. Could you hear the conversation?
> A. Yes.
> . . .
> Q. What did Ms. Claiborne say to the defendant or ask the defendant?
> A . She asked him, was she supposed to sign that form, because it was stating that she was occupying the property, and she wasn't.
> Q. Did you hear Ms. Claiborne tell the defendant that she wasn't going to live in the property?
> A. Yes.
> Q. Did Ms. Claiborne appear concerned about signing this particular form?
> A. Yes.
> Q. What makes you say that?
> A. Because she asked that question, and then after she asked that question, she asked me a question. She asked me did I hear what was being said, and I said, yes, I hear it. And from there she said: Okay. If anything comes up down the line, you told me to sign this. You heard it, Lynn. This is what he told me to do.
> Q. Okay. What was it when Ms. Claiborne turned to the defendant and asked him if she should sign the form and that she wasn't going to be living there, what, if anything, did the defendant say in response to her question?
> A. He told her to sign the document. As long as the payments were

11

made, everything would be fine.

*Id.* at 95:21-97:15.

Ogletree cross-examined Cox. Although his cross-examination was relatively brief, Ogletree elicited compromising admissions from Cox about her own lucrative participation in the scheme, her past criminal activities, her failures of professional ethics, the large sums of money she received as kickbacks for abusing her position of trust as a loan officer, and the relatively much smaller amounts amount of money Ballentine received for his participation. *See id.* at 105:8-115:7.

Marilyn Claiborne was the next key witness to testify. Claiborne was the straw buyer to whom the Spaulding Avenue property's mortgage was issued. Like Cox, Claiborne also described in detail the closing involving that property:

> Q. At some point during the closing were you presented with an owner occupancy affidavit to sign?
> A. Yes.
> Q. And again, this is for the 1506 South Spaulding property. In your own words what does an owner occupancy affidavit basically say?
> A. That you're going to stay on the property.
> Q. That you're going to — I'm sorry.
> A. That you're going to live in the property.
> Q. When you were presented with this owner occupancy affidavit, did you sign it right away or did you pause?
> A. Paused.
> Q. When you paused, what did you do?
> A. I asked the attorney should I sign this because I wasn't going to live there.
> Q. Let's break that down. You said you asked the attorney. Which attorney?
> A. Mr. Ballentine.
> . . .
> Q. And when you — you were there at the closing and you asked him whether you should sign the document. What did you say exactly?
> A. I said I'm not going to live here. Should I sign this?
> Q. When you asked the defendant that question, what, if anything, did he say in response to you?
> A. Go ahead, sign it.
> Q. And what, if anything, did you do when he told you to go ahead and

>sign it?
>A. Went on and signed it.
>Q. At the time that you asked the question and paused about whether you should sign that document, were you prepared at that time not to sign it or to sign it, depending on the answer you got back?
>A. Yes.

*Id.* at 186:8-87:14.

Myers thoroughly cross-examined Claiborne. Like Ogletree did with Cox, Myers elicited testimony from Claiborne about her own past lies, her willingness to commit fraud, and her own lucrative role in the scheme. *See, e.g.*, *id.* at 205:8-10:1, 224:1-27:16, 241:23-44:6. He emphasized that Ballentine made only $350 per closing, a small fraction of the windfall enjoyed by Claiborne and the others involved in the scheme. *See id.* at 257:15-58:11. Myers also questioned Claiborne extensively about why she would have asked Ballentine, whose role was relatively minor, about the occupancy affidavit when she admitted she had not asked anyone else involved in the program a similar question. *See id.* at 237:1-41:3.

### 2. Summerhill Drive and 86th Place witnesses

The next of the key witnesses to testify was Wanda Rivera-Burton. Rivera-Burton was the organizer of the mortgage scheme and herself pleaded guilty to crimes related to the scheme. *See* Trial Tr. Pt. 3, crim. dkt. no. 146, at 401:14-03:15. She testified that she was the person who asked Ballentine to participate in the closings. *See id.* at 318:13-19. Rivera-Burton was present for both the Summerhill Drive and 86th Place closings, which occurred on June 13 and 16, 2005, respectively. In particularly relevant part of her testimony, she testified about a conversation that she and Dina Dunn, the straw buyer of the properties, had at one of these two closings. (As discussed below, Dunn pinpointed the conversation to the Summerhill Drive closing.)

13

More important than the conversation itself was Ballentine's response to it:

> Q. Did Mr. Ballentine attend all of Ms. Dunn's closings?
> A. Yes.
> Q. Now, do you recall a conversation at one of the closings about where Ms. Dunn really lived at the time?
> A. Yes.
> Q. Do you know where Ms. Dunn lived at that time?
> A. Yes.
> Q. Where did she live?
> A. She lived on Blackstone in Hyde Park.
> Q. Now, this conversation, do you recall which closing it was at?
> A. No, I don't.
> Q. Who was present for the conversation?
> A. Myself, Dina [Dunn] and Warren [Ballentine].
> Q. Was there anyone else present at this time?
> A. No.
> Q. Can you describe to the ladies and gentlemen of the jury what the nature of that conversation was?
> A. Dina was rehabbing her house, and I was asking her about the process, how was she doing, how far along she was in the rehabbing of her own home. And Warren advised us that we should not discuss that because someone may get suspicious that she's not buying the property that we were currently closing as her resi — as her primary residence when she's doing all of this work —
> Q. Did —
> A. — to her house.
> Q. I'm sorry. Go ahead.
> A. No, just that, to her house.
> Q. Did the conversation that you and Ms. Dunn were having stop after that?
> A. Yes, it did.
> Q. Did the closing for that transaction go forward?
> A. Yes, it did.
> Q. Do you recall if Ms. Dunn signed an occupancy statement saying she was going to live in that property she was purchasing?
> A. Yes, she did.

*Id.* at 328:10-30:22.

Myers cross-examined Rivera-Burton. He emphasized how much money Rivera-Burton made from the scheme (and how much more she made than Ballentine), her own guilty plea on fraud charges, the incentive she had to shift blame under her plea agreement, inconsistencies in her testimony, and her general character for dishonesty.

14

*See, e.g., id.* at 391:23-98:2; 399:4-407:10.

The last of the key witnesses was Dina Dunn. Dunn was the straw buyer for both the Summerhill Drive and 86th Place properties. Although Rivera-Burton was not sure at which of these closings the conversation about Dunn's home renovation occurred, Dunn's recollection was clearer. She remembered the Summerhill Drive closing because that was where she first met Ballentine:

> Q. Now, when you arrived at the closing for the Summerhill Drive, this closing we just went over here with the documents, who else was there when you arrived?
> A. Initially no one when I arrived.
> Q. What did you do when you arrived there by yourself?
> A. I sat out in the waiting area.
> Q. Who was the next person to arrive?
> A. Attorney Ballentine.
> Q. How did he introduce himself to you?
> A. He introduced himself to me as Attorney Ballentine, that he was going to be my lawyer representing me in this real estate transaction.

Trial Tr. Pt. 4, crim. dkt. no. 135, at 502:13-24. Dunn next described Rivera-Burton's arrival at the closing:

> Q. When Ms. Wanda Rivera-Burton arrived, did she make any introductions?
> A. Yes. She reintroduced us to each other. We said we had already met, and she said that he also had been an investor in the program as well.
> Q. And was it necessary or did she say that he was the attorney here to represent you or —
> A. She didn't say it again. We kind of laughed because he had just introduced himself.
> Q. Did it appear to you that the defendant and Ms. Rivera-Burton were familiar with each other?
> A. Yes, sir.
> Q. And what makes you say that?
> A. They were having a conversation amongst themselves.

*Id.* at 504:10-23.

Dunn then fully corroborated Rivera-Burton's testimony regarding their conversation about Dunn's home renovation and Ballentine's notable reaction:

15

> Q. When you, Ms. Wanda Rivera-Burton and the defendant were sitting there before the closing in the conference room, did the topic of your Blackstone home come up during the wait?
> A. Yes.
> Q. Tell the ladies and gentlemen of the jury how that topic came up.
> A. Wanda brought up the fact that I had just had a lot of rehab work done to my home on Blackstone and how nice it was.
> Q. And when Wanda brought that up, Ms. Rivera-Burton, how, if at all, did the defendant react?
> A. He kind of hushed us down with his hands. He kind of leaned back in the chair a little bit and hushed us down, kind of rolled his eyes at us and asked us to stop talking about it.
> Q. When you and Ms. Rivera-Burton were discussing rehab work that you had done to your Blackstone home, was it clear that you were living in the Blackstone property?
> A. Yes, because she mentioned that I was living in the house.
>  . . .
> Q. What was — you mentioned the defendant hushed you and Ms. Burton. Was there any other discussion about the Blackstone property?
> A. We didn't get into further discussion about the Blackstone property, but he did tell me to — if someone asked to say that I was moving into the property after the closing, that we shouldn't be talking about that house right now.
>  . . .
> Q. When the defendant told you to say that you would be moving into the property, what property was he referring to that you needed to say you'd be moving into?
> A. The one we were closing on in Summerhill.

*Id.* at 506:20-08:10.

Finally, Dunn also testified about the 86th Place closing, which took place just three days after the closing for the Summerhill Drive property.

> [Q.] Who attended the 912 West 86th Place closing?
> A. Wanda and myself and Attorney Ballentine.
> Q. At this particular closing, the 912 West 86th Place one, who did you understand the defendant to be representing at this closing?
> A. Me, Dina.
> Q. And again, what was your understanding based on?
> A. The previous closing that took place a couple of days earlier, and he was there for this closing as well.
>  . . .
> Q. What, if anything, happened when the loan processor was handing you the documents?
> A. Attorney Ballentine instructed her to pass them through him first. You

16

> know, he kind of made a joke that he was my attorney, he needed to get paid for his job today.
> . . .
> Q. Did the defendant say anything when handing you the documents?
> A. He would read the title to me, and again, if they weren't self-explanatory, he would explain just a brief description of what it was and tell me where to sign.
> . . .
> Q. During the closing for 912 West 86th Place, the defendant handed you an occupancy affidavit and financial status?
> A. Yes.

*Id.* at 526:5-13; 528:1-5; 528:15-19; 529:9-11.

Ogletree cross-examined Dunn extensively. As with the other key witnesses, he challenged Dunn's credibility. He confronted her with evidence that she had previously lied to FBI agents investigating the mortgage fraud scheme, that she had herself profited from the scheme in which she now accused Ballentine participating, and that she had pleaded guilty to crimes arising from the mortgage fraud. *See, e.g.*, *id.* at 538:1-39:10; 550:15-25. Ogletree also methodically emphasized Dunn's professional background and ethical failure; Dunn had been a licensed real estate agent before she got caught up in the scheme and admitted that she was knowledgeable about regulations governing real estate transactions. *See id.* at 542:3-25. With that background in place, Ogletree elicited dozens of admissions from Dunn that she lied to benefit herself.

**C.     Application**

In view of the testimony described above and other evidence, the jury concluded that the government had proven beyond a reasonable doubt that Ballentine committed fraud. Ballentine now asks the Court to find both that Ogletree's performance was "objectively deficient" and that Ballentine "was prejudiced by the subpar representation." *Jones*, 635 F.3d at 915.

First, as the exhaustive review produced above details, Ogletree's performance was not objectively deficient. This Court stated in its order on Ballentine's previous 2255 motion that Ogletree's cross-examination of the relevant witnesses, though certainly briefer than Myers' cross-examinations, was capable and strategic. *See Ballentine*, 2017 WL 3704847, at *4. His cross-examinations of Cox and Dunn followed a similar pattern to those performed by Myers—he attacked the witnesses' credibility by highlighting their own roles in the fraud scheme, their previous lies, their financial interests, and their ethical lapses. It is true now, as it was when the Court decided Ballentine's previous motion, that "the record reflects that Ogletree attacked the credibility of the witnesses in a reasonably effective way. 'That the jury ultimately believed the cumulative testimony of multiple government witnesses is not for this Court to contradict.'" *Id.* (quoting *Hardamon v. United States*, 319 F.3d 943, 950 (7th Cir. 2003)).

Second, even if Ballentine had shown that Ogletree's cross-examination of the relevant witnesses was objectively deficient, he has not established that he was prejudiced. To prove prejudice arising from an alleged failure to adequately cross-examine a witness, the petitioner must explain "what [the witnesses'] responses to further cross-examination might have revealed [and] how those responses might have affected the result" at trial. *United States v. Rodriguez*, 53 F.3d 1439, 1449 (7th Cir. 1995).

As in his first 2255 motion, Ballentine again lists ways in which he asserts he has been damaged by his conviction. Among other things, he blames his conviction for a loss of income and for his mother's death because he was unable to pay or a life-saving

18

procedure. As the Court stated, "[a]lthough these consequences of Ballentine's conviction are unfortunate to say the least, they do not establish that Ballentine was prejudiced in the way *Strickland* requires—i.e., [that] there is a reasonable possibility that the outcome of his trial would have been different if Ogletree had performed differently at trial." *Ballentine*, 2017 WL 3704847, at *4.

This conclusion is reinforced by the Court's exhaustive review of the trial record. Specifically, the record reflects that Ogletree and Myers split the cross-examinations of the key witnesses discussed here. Each cross-examined one of the two witnesses who testified about the closings on each of the three properties. The result, then, is that even if one assumes that Ogletree's cross-examinations of Cox and Dunn were objectively deficient, Myers' cross-examinations of Claiborne and Rivera-Burton about the very same closings would ameliorate any concerns regarding prejudice. Put another way, there was at least one witness to each of the transactions underlying Ballentine's conviction who was cross-examined by Myers, an attorney that Ballentine has not contended (and apparently has no basis to contend) was ineffective during his trial.

The Court acknowledges that this is a difficult result for Ballentine. Criminal convictions have harsh consequences, even when, as in this case, the sentence is relatively lenient. But this Court's authority to grant relief under section 2255 is limited; it may do so "only for an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently resulted in the complete miscarriage of justice." *Harris*, 366 F.3d at 594 (internal quotation marks omitted). After thoroughly reviewing the record multiple times, the Court concludes that this is not such a case.

**Conclusion**

For the foregoing reasons, the Court denies Ballentine's motion under 28 U.S.C. § 2255 to vacate, correct, or set aside his conviction and sentence [civ. dkt. no. 19] as well as his motion entitled "motion to vacate the verdict and fines" [civ. dkt. no. 22]. The Clerk is directed to enter judgment dismissing Ballentine's motion under 28 U.S.C. § 2255 with prejudice. The Court grants a certificate of appealability under 28 U.S.C. § 2253(c).

```
                                        _____
                                              MATTHEW F. KENNELLY
                                              United States District Judge
```

Date: March 11, 2019